UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAROLYN WILLIAMS,

                              Plaintiff,

            - against -

THE DEPARTMENT OF EDUCATION OF THE
CITY OF NEW YORK,

                              Defendant.

**REPORT AND
RECOMMENDATION**

11 Civ. 6158 (PAE) (RLE)

To the HONORABLE PAUL A. ENGELMAYER, U.S.D.J.:

## I.   INTRODUCTION

Plaintiff Carolyn Williams ("Williams") brings this action pursuant to Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, Williams claims that the

Department of Education of the City of New York ("DOE") discriminated against her on the

basis of race by terminating her employment as a full-time probationary paraprofessional.  The

DOE moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the

reasons that follow, I recommend that the DOE's motion be **GRANTED**.

## II.   BACKGROUND

Williams identifies as an African-American.  (Caroline Williams Dep., June 26, 2012

("Williams Dep.") 10:1-2.) Starting in January 2008, she was employed by the DOE as a

substitute paraprofessional on a part-time, as-needed basis at P.S. 176X, a school for children

with special needs and autism.  (Decl. of Principal Rima Ritholtz ("Ritholtz Decl.") ¶¶ 2, 8-10;

Williams Dep. 41:7-13.)  P.S. 176X has approximately 765 students between the ages of five and

twenty-one.  (Ritholtz Decl. ¶ 2.)  A certified teacher, assisted by one or more paraprofessionals,

runs a class of six to twelve students   (Ritholtz Decl. ¶ 2.)

In November 2010, P.S. 176X Principal Rima Ritholtz approved Williams for a full-time paraprofessional position.  (Ritholtz Decl. ¶¶ 7-8.)  Williams began her probationary period on November 23, 2010.  (Decl. of Neal Brandenburg ("Brandenburg Decl.") ¶ 3.)  The probationary period for full-time paraprofessionals is ninety-two school days, excluding holidays and weekends, after which a paraprofessional acquires grievance rights pursuant to the collective bargaining agreement that governs DOE employment. (*Id.*)

Williams worked in a classroom that was divided by bookcases into two separate areas.  (Williams Dep. 57:4-5, 14-24.)  Williams was responsible for assisting Angela Guglielmo, a teacher at the school.  (Williams Dep. 51:3-5; 53:7-15.)  Guglielmo's class contained four students, with two students being assigned to their own paraprofessionals.  (Williams Dep. 78:16-25.)  Guglielmo worked on one side of the classroom, while another teacher, Danielle Zoella, along with her own paraprofessional, Dulce Infante, supervised a different class on the other side of the classroom.  (Williams Dep. 57:4-5, 14-24; 135:21-22.)

## A.   Williams's Incident with Angela Guglielmo

On February 11, 2011, Williams had an argument with Guglielmo while students were in the classroom.  Williams raised her voice, was described as being upset, and told Guglielmo to "go and get your mother." (Williams Dep. 123: 16-24; 124:18.)  Several staff members at P.S. 176X reported that Williams was yelling at Guglielmo, banging her hand on the desk, slamming the lockers in the classroom, and told Gugielmo that she did not "care if you go get your momma." (Decl. of Assist. Corp. Counsel Damion K.L. Stodola ("Stodola Decl."), Ex. F.) Williams admits that she "started closing doors," but testified that she "wasn't running around slamming doors."  (Williams Dep. 126: 2-5.)

Principal Ritholtz was not present in the classroom at any time during the incident.

2

(Ritholtz Decl. ¶ 11.)  Both Zoella, the teacher in the adjoining classroom, and Infante, the

classroom paraprofessional in the adjoining classroom, witnessed the incident and provided

written statements.  (Ritholtz Decl. ¶ 13.)  In addition, Vernee Butterfield, a speech therapist,

who witnessed the incident, and Kimberly DiDio, a teacher, who was in an other adjoining

classroom, provided witness statements. (Ritholtz Decl. ¶ 13.)

**B.      Williams's Termination**

By letter dated February 18, 2011, Ritholtz terminated Williams's probationary service.

(Ritholtz Decl. ¶ 14.)  The letter describes the allegations concerning the February 11, 2011

incident, and stated that several staff members reported to assistant principal Yvette Berger that

Williams lost her temper and was yelling at a teacher in front of her students.  (Stodola Decl.,

Ex. F.)  The termination letter also stated that when asked to assist an autistic student Williams

was insubordinate and her conduct was "unbecoming [of] a professional educator."  (*Id.*)

Before the February 11, 2011 incident, Williams had met with Ritholtz and other

members of the classroom to discuss general classroom friction. (Ritholtz Decl. ¶ 18.)  She was

not subject to any discipline at this meeting.  (*Id.*)

**C.      Williams's Claims of Racial Discrimination**

Williams asked to speak with Ritholtz after receiving the termination letter. (Williams

Dep. 151:16-22.)  She states that she told Ritholtz that her termination was a "racial thing"

because it took place during black history month.  (Williams Dep. 153:5-8.)  Williams asserts

that the termination letter is the basis for her belief that race was a factor in the DOE's decision

to terminate her.  (Williams Dep. 196: 20-23.)  She also claims that the letter was "describing an

ignorant black person" because it referred to Williams as "using ignorant language, slamming,

and banging and yelling." (Williams Dep. 159: 9-10.)  More specifically, Williams finds racial

animus in the use of the phrase, "go get your momma," to describe words she used in her disagreement with Guglielmo. (Williams Dep. 160:8.) She testified that she used the word "mother" and not the term "momma." (Williams Dep. 124: 18, 24-25.) Williams claims that Ritholtz verbally told her that she was being fired because Williams had issues dealing with a student with autism. (Williams Dep. 199:8-10.) Williams appears to be arguing that the informal "momma" has racial overtones and therefore it is appropriate to infer racial animus. In response, Ritholtz points out that the word use did not originate with her. The language used in the termination letter, "I don't care if you go get your momma" and "I don't care if you call your momma," are what witnesses reported to Ritholtz. (Ritholtz Decl. ¶ 17.) Williams concedes that she has never heard Ritholtz or Burger make any comment about her or anyone else's race. (Williams Dep. 197:23- 198:11.)

In addition to her allegations concerning the incident with Guglielmo, Williams presented more general allegations. Although she concedes that she has not personally witnessed any harassment, (Williams Dep. 177:5-7), Williams claims that Ritholtz "constantly harass[ed]" and gave "un-sats"[1] to the African-American teachers at P.S. 176X. (Williams Dep. 176:11-16.) She identified one African-American teacher, "Cathy," who told Williams that she had heard from another teacher who was also allegedly being harassed by Ritholtz. (Williams Dep. 176:18- 177:6.) Williams did not identify Cathy's last name. (Williams Dep.. 176:24.) Williams also alleges another unnamed African-American paraprofessional had some unspecified problems with Ritholtz. (Williams Dep. 178:20-179:8.) Williams has not witnessed any of these problems and the unnamed paraprofessional still works at P.S. 176X. (Williams

---

[1] The teacher performance rating of "unsatisfactory" was commonly referred to as "un-sats" and "U-rated" by Williams in her deposition testimony. Williams also testified that she was told "once you get one or two unsatisfactory [ratings] you really can't get a job at another school." (Williams Dep. 178:16-17.)

Dep. 179:19-180:2.) She also identifies "Sophie," an African-American paraprofessional, whom she claims acted inappropriately in front of students and is still employed at P.S. 176X. (Williams Dep. 192:17- 194:25.) Lastly, Williams alleges that an unnamed non-African-American paraprofessional who was "getting too personal with parents" was not terminated. (Williams Dep. 191:2-192:13.)

### III.    DISCUSSION

#### A.    Legal Standards

##### 1.    Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of establishing that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 232 (1986). The movant's burden will be satisfied if it can point to an absence of evidence to support an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 322-23. Once the movant makes a properly supported motion, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "In considering the motion, a court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). Summary judgment should be granted where no reasonable trier of fact could find in favor of the nonmoving party, *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 252 (1986), thereby "dispos[ing] of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834

F.2d 54, 58 (2d Cir. 1987).

### 2.    Analytical Framework for Summary Judgment in Discrimination Cases

Title VII makes it unlawful for an employer, *inter alia*, to "discharge any individual . . .

because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).  Discrimination cases based

on circumstantial evidence brought pursuant to the Title VII are analyzed under the familiar

burden-shifting framework established in *McDonell-Douglas Corp. v. Green*, 411 U.S. 792, 802-

03 (1973).

Under the burden-shifting framework, a plaintiff must first establish a *prima facie* case

by showing that "(1) at the relevant time the plaintiff was a member of the protected class; (2)

the plaintiff was qualified for the job; (3) the plaintiff suffered an adverse employment action;

and (4) the adverse employment action occurred under circumstances giving rise to an inference

of discrimination." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).  The

plaintiff's burden in establishing a prima facie case is *de minimis*.  *Gue v. Suleiman*, No. 10 Civ.

8958, 2012 U.S. Dist. LEXIS 141295, at *18 (S.D.N.Y. Sept. 27, 2012 ).  If the plaintiff

establishes a *prima facie* case, the burden of production shifts back to the employer to set forth a

legitimate non-discriminatory reason for its action.  *Patterson v. Cty. of Oneida*, 375 F.3d 206,

221 (2d Cir. 2004) (citation omitted).  The burden then shifts back the plaintiff to show that the

employer's reason is false and that it masks the employer's true discriminatory reason.

*Paterson*, 375 F.3d at 221.  In essence, the plaintiff must prove pretext for discrimination by

showing that the reason for the adverse action "was false, and that the discrimination was the

real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.  Ultimately, the plaintiff bears the burden

of persuading the trier of fact of intentional discrimination by the employer.  *James v. New York

Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

6

**B.**     **Williams' Title VII Race Discrimination Claim**

Williams argues that her termination by the DOE was the product of discrimination on the basis of her race in violation of Title VII of the Civil Rights Act of 1964. Williams argues two theories of racial discrimination. First, she claims that her termination letter incorrectly states that she told a teacher to "go get your momma," when she alleges she actually told the teacher to "go get your mother." Second, Williams argues that she was treated worse than similarly situated paraprofessionals who did not identify as African American.

Williams fails to establish a *prima facie* case because she has offered no evidence to support her argument that the termination letter evidences Ritholtz's unlawful bias. Williams' subjective belief that her termination was motivated by race, standing alone, cannot establish a *prima facie* case of discrimination. *See Rosario v. New York City Dep't of Educ.*, No. 10 Civ. 6160, 2012 U.S. Dist. LEXIS 109267, 20-21 (S.D.N.Y. Aug. 3, 2012) ("such blanket and non-descript allegations – essentially boiling down to allegations about [plaintiff's] subjective feelings about unspecified conduct of others – fall far short of establishing a prima facie case." (*citing Dawkins v. Witco Corp.,* 103 F. Supp. 2d 688, 697 (S.D.N.Y. 2000)); *see also Toriola v. New York City Transit Auth.*, No. 02 Civ. 5902, 2005 WL 550973 (S.D.N.Y. Mar. 9, 2005) (plaintiff's testimony that termination was due to "the way I talk" did not "create an issue of material fact" warranting denial of summary judgment motion in a Title VII national origin discrimination claim).

Williams alleges that the use of the phrase "go get your momma" in the Ritholtz's termination letter is evidence of racial animus. At her deposition, she testified that she believed that phrase and references to her behavior were equivalent to a racial epithet. (Williams Dep. 159:3-161.3). Further, Williams equates the references to her behavior with "describing an

ignorant black person" and "calling them a nigger." (Williams Dep. 159:10; 159:17.)  When asked to explain why she believed the statements evidenced racial animus, she offers that it is a "bad thing for a bad person to say." *(*Williams Dep. 160:3.)

Courts "must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Mayling Tu v. OppenheimerFunds, Inc.*, No. 10 Civ. 4971 (PKC), 2012 WL 516837, at *6 (S.D.N.Y. Feb. 16, 2012) (*citing Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999)).   Title VII is not "a general civility code." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998).  Even when comments are "rude and derogatory," a person cannot make out a prima facie case of discrimination because something bad happened to them. *Bickerstaff*, 196 F.3d at 448;  *see also Magadia v. Napolitano,* 2009 WL 510739, at *13 (S.D.N.Y. Feb. 26, 2009).

It is undisputed that the termination letter's use of the phrase "go get your momma" quotes from statements reported to Ritholtz by other employees, including Guglielmo, DiDio, and Zoella. (Williams Dep. 163:8-11.)  The termination letter specifically references Guglielmo and Williams.  (Stodola Decl., Ex. F.)  Williams has failed to point to any explanation of how the witnesses' statements, or Ritholtz's reference to them in the termination letter was evidence of Ritholtz's racial animus.  Therefore, the termination letter and the words therein cannot, by itself, establish Ritholtz's discriminatory animus. *See, e.g., Toriola v. New York City Transit Auth.*, No. 02 Civ. 5902, 2005 WL 550973, at *10 (S.D.N.Y. Mar. 9, 2005) (plaintiff's testimony that discrimination was a result of "the way I talk" was speculative and an insufficient showing of discriminatory intent).

8

Williams seeks to bolster her claim of racial discrimination by arguing that the racial composition at P.S. 176X was imbalanced and that the African-American teachers and paraprofessionals were harassed and mistreated by Ritholtz. This bare allegation without any showing of discriminatory practice is insufficient to prove discrimination. *See Branch v. Sony Music Entm't, Inc.*, No. 97 Civ. 9238 (TPG), 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001) *aff'd*, 34 F. App'x 23 (2d Cir. 2002) ("A racial imbalance in the makeup of a workplace is insufficient, by itself, to demonstrate discrimination."). Moreover, Williams acknowledged that she was not aware of the entire racial makeup of all sites under Ritholtz's supervision. (Williams Dep. 180:17-181:7.)

Williams's allegations that Ritholtz harassed and mistreated African-Americans are merely speculation and subjective beliefs. *See Richards-Byers v. New York City Dep't of Fin.*, 449 F. App'x 55, 57 (2d Cir. 2001) (holding that speculation and conclusory allegations cannot by themselves create a genuine issue of material fact to withstand summary judgment). She alleges, for example, that an African-American paraprofessional, who asked Williams to withhold her name because of fear of potential backlash by Ritholtz, had "problems" with Ritholtz over alleged stolen iPads. (Williams Dep. 178:20-179:8.). Williams stated that the unnamed paraprofessional was allegedly questioned by Ritholtz and had to sign a police report as a result, and that one of the iPads was found in a white teacher's classroom. She alleges that Ritholtz never questioned the teacher in whose room the iPad was found. (Williams Dep. 179:2-18.) She also alleges that a teacher whom she could only identify as "Cathy" was harassed and received "U-ratings." As with the unnamed paraprofessional, however, Williams does not have any direct knowledge to support these allegations. (Williams Dep. 176:18-177:6.) Discriminatory intent cannot be inferred from such unsupported allegations that amount to mere

9

speculation. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

Lastly, since Ritholtz hired Williams and later terminated her, the "same actor inference" applies. When the same actor who hires a person already within the protected class subsequently fires that same person, "it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (*quoting Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). This creates an inference against any discriminatory intent. *Id.* Ritholtz approved Williams's appointment in November 2010 and terminated her probationary employment in February 2011. (Ritholtz Decl. ¶ 8, 14.) Courts have found the inference against discriminatory intent as a motivating factor in the employment decision particularly strong where the termination occurs within such a relatively short time after the hiring. *See Grady*, 130 F.3d at 560; *see, e.g., Dixon v. Int'l Fed'n of Accountants*, No. 09 Civ. 2839, 2010 WL 1424007 (S.D.N.Y. Apr. 9, 2010) *aff'd*, 416 F. App'x 107 (2d Cir. 2011) (inference applies where time period was less than two years). As a result, Williams has failed to overcome the "same actor inference."

Williams has offered no evidence sufficient to proof that the DOE's non-discriminatory reason for her termination is both false and a pretext for racial discrimination. The termination letter states that Williams was terminated because she lost control of her temper and had an argument with a teacher in front of students. (Stodola Decl., Ex. F.) Williams does not dispute the incident, only its severity. (Williams Dept. 126:2-5.) Williams also argues that Ritholtz told her she was being terminated because of her failure to address the needs of an autistic student. (56.1 Statement, ¶ 33.) This argument, however, is "self-defeating since it asserts that plaintiff was fired for a reason that has absolutely nothing to do with" Williams's race. *Toriola*, 2005

10

WL 550973, at *10.   She has failed to provide any evidence to indicate that her termination was because of anything other than insubordination, lack of professionalism, and exercise of poor judgment.

## IV.   CONCLUSION

For the forgoing reasons, I recommend that the DOE's summary judgment motion be **GRANTED**.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul A. Engelmayer, 40 Foley Square, Room 2201, and to the chambers of the undersigned, Room 1970.  Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: June 3, 2013**
**New York, New York**

The Honorable Ronald L. Ellis
United States Magistrate Judge

11